IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

FILED
OCT 1 2001
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

LEANNA PERRY, ET AL., )
)
   Plaintiffs, )
)
v. ) CIVIL ACTION NO. CV-00-PT-3121-M
)
VICKI GRANT, ET AL., )
)
   Defendants. )

ENTERED
OCT 1 2001

## MEMORANDUM OPINION

This cause comes to be heard on defendants Vicki Grant ("Grant") and Randall Johnson's ("Johnson") Motion for Summary Judgment filed on July 16, 2001.

### FACTS

Plaintiffs Leanna Perry ("Perry"), Larry Williams ("Williams"), and Linda Reaves ("Reaves") are residents of Etowah County, Alabama. All three plaintiffs are Caucasian.

Defendant Grant is an employee of the Etowah County Sheriff's Department. Defendant Johnson is also an employee of the Etowah County Sheriff's Department. Grant and Johnson are both Caucasian.

The operation of bingo games in Etowah County is regulated pursuant to the "Etowah County Bingo Act." 1989 Ala. Acts 463 (amended 1994). The Act allows "qualified organizations"[1] to operate bingo games in Etowah County for "bona fide charitable, educational or other lawful purposes...." *Id.* at § 4(a). The Act provides that

---

[1] The term "qualified organization" is defined in the 1994 amendment as follows: "Qualified organization" means a bona fide religious, educational, service, senior citizens, fraternal, or veterans' organization located in and serving the people of Etowah County which operates without profit to its members and which has been in existence continuously for a period of five years and is exempt from taxation by virtue of having been classified as a tax exempt nonprofit organization by the Internal Revenue Service, United States Government. 1994 Ala. Acts 135, § 2(2).

38

> [i]t is the intention of the legislature that only qualified organizations which are properly issued permits or licenses . . . shall be allowed to operate bingo games. A qualified organization shall not lend its name or allow its identity to be used by any other person in operating or promoting a bingo game in which said other person is substantially financially interested.

1994 Ala. Acts 135, § 7(a). No qualified organization is permitted to operate a bingo game without first obtaining a permit from the sheriff's department. 1989 Ala. Acts 463, § 4(a). The applicant for a permit must provide the sheriff's department with the following information: the name and address of the applicant; the names and addresses of each persons who will be operating or promoting the bingo game; the names and home addresses of any persons acting as sureties for the applicant; the location at which the applicant will conduct the bingo games; and a statement showing the convictions for criminal offenses of any person operating the bingo games. 1989 Ala. Acts. 463. If the application is approved by the sheriff's department, then the applicant receives a permit to conduct a "bingo session" during "a consecutive period of time not to exceed five consecutive hours during which bingo is played in a given day and not to exceed two such days in a given week. . . ." 1994 Ala. Acts 135, § 2(6).

The Coosa Valley Elks Lodge[2] ("Lodge") had a permit to operate bingo games in Etowah County. The Lodge's 1995 application requested permission to play in Attalla on Monday and Tuesday nights from 7:00 to 9:30 p.m. The application was later amended to allow play on Wednesday and Thursday nights at the same time. The Lodge's most recent application, dated March 7, 2000, requested permission to play bingo at 301 North 12th Street ("the Agricola Shopping Center") on Wednesday and Thursday. The application did not mention a time change.

---

[2] The Coosa Valley Elks Lodge is an all-male and all-black fraternal organization.

2

Grant had been assigned by Sheriff James Hayes ("Hayes") the task of monitoring bingo games in Etowah County in an effort to ensure that all permit holders complied with the requirements of the Act. During her efforts, Grant became aware that "early bird"[3] games were being played in violation of the Act. Grant informed the charities by letter that early bird games would not be allowed. Subsequently, Grant received a tip from a confidential informant that individuals leasing the Agricola building were actually operating the bingo games and not the members of the charitable organizations.[4] Acting on this information, Grant authorized an investigation of the Agricola bingo games.

On January 6, 2000, defendant Johnson went undercover to the Agricola bingo hall to investigate the allegations of early bird bingo. Johnson entered the bingo hall around 5:45 p.m. and heard an announcement that early bird games would begin at 6:00 p.m. He then picked up a bingo program that stated that the Elks Lodge bingo games would begin at 7:00 p.m. Johnson noticed two black men behind the main counter. He approached the counter and spoke with Ivey. Johnson asked Ivey about playing early bird games and was informed by Ivey that "I don't sell early bird." At some point during this discussion Perry exited the office near the cash register and informed Johnson that early bird cards had to purchased "on the floor." Perry pointed in the direction of Williams and told him to sit down and the floor man would come and

---

[3] These are games that are started and completed prior to the times requested on the permit holder's application.

[4] Apparently, this was not the first time that the Etowah County Sheriff's Department and Grant had problems with the lessor of the Agricola Shopping Center concerning violations of the Act. The former lessor, Larry Macino, had leased space and bingo equipment for $1000 per session for each organization. Grant had also received reports that Macino paid outsiders to operate the bingo games and accounted for their pay as janitorial and maintenance expenses. Based on the $1000 nightly rent, the Etowah County Commission ordered the charities to cease operating with Macino for 240 days. Before Macino left town, he informed James Ivey, the Elks Lodge Exalted Ruler, that Douglas Gustafson would continue to operate the building and facilitate the bingo games. Gustafson leased the building and bingo equipment to the Lodge for $700 per session.

assist him after he raised his hand. Johnson purchased from Perry a "dauber" or ink stamp to mark his cards and then followed her directions. After sitting down and raising his hand, Williams approached him and asked him what he wanted. Johnson requested three cards and paid Williams his money.

Johnson proceeded to play three games of bingo. He witnessed Williams make pay-outs to three different winners. He did not see anyone else working the floor that evening. During the time that these events transpired, Reaves operated as the "caller" for the bingo games. Around 7:00 p.m., Reaves announced that early bird bingo was over and that the Coosa Valley Elks Lodge bingo would begin at seven. After this announcement, Johnson left the bingo hall and walked outside. Perry followed him outside and asked if there was a problem. She appeared "upset" for some reason. She informed Johnson that he should "stay and play regular bingo." Johnson declined and Perry went back inside.

After Perry went back inside, Johnson phoned Grant and discussed the situation. Grant decided to re-enter the building. Perry refused to allow Grant and Johnson to look at the books. Johnson obtained a search warrant granting the authority to do so. Eventually, Perry, Reaves and Williams were arrested . After a preliminary hearing the criminal charges against the plaintiffs were dismissed.

Perry, Reeves and Williams were on the Lodge's "Active Volunteer List" that was submitted to the Etowah County Sheriff's Department. Reeves worked as a "caller" and "volunteered" for the Lodge on Thursday nights from 6:00 to 10:00 p.m. Perry was employed by Douglas Gustafson, d.b.a. API, and was responsible for opening and closing the doors of the

Agricola on January 6, 2000.[5] She would assist the Lodge as an extra "volunteer" by handing out books and stamping bingo sheets. Williams worked the floor "selling the warm up sheets, trading bonanzas and checking the bingos." He also "volunteered" for the Lodge on Thursday nights from 6:00 to 10:00 p.m.

Along with the services of Perry, Reeves, and Williams, the Lodge had three of its members on hand to serve as volunteers. James Ivey sold regular packets of bingo cards. Robert Thomas worked the floor. Nathan Graham sold early bird bingo cards.

The Lodge did not compensate Perry, Reaves and Williams for their services on the night in dispute. According to Ivey, Perry, Reaves and Williams have never been members of the Lodge and have never volunteered for other charitable activities sponsored by the Lodge. Ivey did not know the people who "volunteered" to operate bingo games at the Agricola. The names and numbers of these "volunteers" were taken from a list previously assimilated by Macino and circulated to the charities. After the January 6, 2000 investigation, it became evident that the other qualified organizations operating at the Agricola were all using the same non-member "volunteers."

Perry, Reaves, and Williams brought suit in this court against Grant and Johnson, in their individual capacities, alleging that they were subject to false arrest/false imprisonment, violations of their first amendment rights, malicious prosecution, defamation of character, and violations of the Equal Protection Clause. By order of this court dated February 6, 2001, the first amendment claim and all state law claims were dismissed. By order of this court dated March 15, 2001, the defamation claim was dismissed. Grant and Johnson now move for summary

---

[5] Perry received an annual salary of $32,400 from API and her hours were "well, whenever bingo was operated."

judgment as to the false arrest/false imprisonment and the Equal Protection Clause claim.

## ARGUMENTS

Regarding the false arrest/false imprisonment claim, defendants argue that they are entitled to summary judgment on the basis that, even viewing the facts in a light most favorable to the plaintiffs, the defendants possessed probable cause for the arrests. In the alternative, defendants contend that they are entitled to qualified immunity with respect to the false arrest/false imprisonment claim. Turning to the equal protection claim, defendants argue that they are entitled to summary judgment because the plaintiffs have failed to create a genuine issue of fact as to whether they were similarly situated with those not arrested. In the alternative, defendants contend that they are entitled to qualified immunity with respect to the equal protection claim.

### *False Arrest/False Imprisonment Claim*

Defendants argue that they are entitled to summary judgment because they possessed probable cause to arrest the plaintiffs. They contend that the sole question is whether "the facts and circumstances within [law enforcement officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Grayson v. Thompson*, 2001 WL 798633, at *21 (11th Cir. 2001). Defendants contend that probable cause "does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information,' and probable cause 'must be judged not with clinical detachment but with a common sense view to the realities of normal life.'" *Marx v. Gumbinner*, 905 F.2d 1503, 1506 (11th Cir. 1990) (internal citations omitted). Defendants argue that they had probable cause to arrest the plaintiffs for three main reasons.

6

First, a reasonable police officer relying on a confidential informant could have concluded that the plaintiffs, acting as agents of Gustafson or others, were actually running the early bird games that night. Defendants note that Perry sold Johnson a dauber and appeared to be in control of the area where bingo cards were sold. They point out that Williams "worked the floor" and sold Johnson his early bird cards. They further allege that Perry did all the "calling" while Johnson was present. In light of these facts, defendants argue that they had probable cause to arrest the plaintiffs.

Second, a reasonable police officer would have probable cause to believe that Gustafson, through his agents, was running the games prior to the time the charity games began. Defendants note that the Lodge's bingo application called for games to begin at 7:00 p.m. Additionally, Gustafson's lease with the Lodge did not begin until 7:00 p.m. Defendants also point out that the bingo program stated that Lodge bingo would begin at 7:00 p.m. They also assert that Reaves announced that Lodge bingo would begin at 7:00 p.m. Finally, defendant Johnson notes that he witnessed bingo games being played at 6:00 p.m. and that he played in several of them. Given these facts, defendant contend that they had probable cause to arrest the plaintiffs.

Finally, defendants argue that they had probable cause to arrest the plaintiffs because Perry acted nervously when Johnson got up from the bingo table and went outside. They contend that this nervous behavior was exhibited when Perry followed him outside the bingo hall and questioned him concerning his motives for leaving. *Relying on Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (concluding that nervous behavior can support a Terry stop) *and United States v. $67,220.00*, 957 F.2d 280, 285-86 (6th Cir. 1992) (citing nervousness of claimant as one probative factor).

7

In the alternative, defendants argue that they are entitled to summary judgment because they are entitled to qualified immunity. According to the defendants, this court "'must first determine whether the Plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'" *Wilson v. Lane*, 526 U.S. 603, 609 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)). They argue that they are protected in their individual capacity by qualified immunity as long as "a reasonable officer could have believed [his actions] to be lawful, in light of clearly established law and the information [that the officer] possessed." *Anderson v. Creighton*, 483 U.S. 635, 636 (1987). In determining whether the law is clearly established, defendants state that the case law must "dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc). Furthermore, the defendants contend that the traditional probable cause standard changes to *arguable* probable cause under the qualified immunity analysis. *See Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990). Defendants assert that under this standard, if an officer reasonably, but mistakenly, concludes that probable cause exists, he still should be granted summary judgment on the basis of qualified immunity. *Id.*; *see also Moore v. Gwinnett County*, 967 F.2d 1495, 1497 (11th Cir. 1992).

Defendants argue that they are entitled to qualified immunity under this arguable probable cause standard because the "line between volunteering" and "operating the bingo games" is "exceedingly fine." Furthermore, they note that the plaintiffs cannot produce any authority, arising out of materially similar facts, which would have drawn a constitutional bright

8

line that they should have known not to cross.⁶

### *Equal Protection Clause Claim*

Defendants argue that they are entitled to summary judgment because the plaintiffs have failed to identify the alleged group or class to which they belong, they have failed to allege intentional discrimination, they having failed to allege that others similarly situated have been treated differently, and they failed to allege the lack of rational basis for the discrimination. *See Williams v. Pryor*, 240 F.3d 944, 951 (11th Cir. 2000). The defendants contend that they simply arrested all persons who were not members of the charity licensed to play bingo and appeared to be operating the illegal bingo games. They note that they did not arrest the black persons assisting in operating the games because they were all members of the charity licensed to operate the bingo games.

Additionally, defendants argue that summary judgment is appropriate because they are entitled to qualified immunity. They assert that the plaintiffs cannot produce any cases establishing that officers like the defendants should have known that the arrests violated the equal protection clause.⁷

In response, plaintiffs argue that the defendants are not entitled to summary judgment on the merits of their equal protection claim because a genuine issue of material facts exists as to whether they were treated differently than three black volunteers that were working at the bingo hall on the night in dispute. According to the plaintiffs, the equal protection clause has been

---

⁶ The plaintiffs did not respond to defendants' arguments regarding the false arrest/false imprisonment claim in their pleading entitled "Plaintiffs' Response to Defendants' Motion for Summary Judgment." The court will grant defendants motion as to these claims.

⁷ In contrast, defendants rely on *Foy v. Holston*. 94 F.3d 1528 (11th Cir. 1996). In *Foy*, the court granted public officials qualified immunity despite evidence of discriminatory intent because it found that a reasonable officer would nonetheless have found the defendant's actions lawful.

violated when a plaintiff proves that he has been treated differently from others who were similarly situated and that there is no basis for the difference in treatment. *Citing Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). The plaintiffs contend that both prongs of the *Willowbrook* test have been satisfied and, thus, summary judgment is inappropriate.

Plaintiffs argue that they have satisfied the first prong of the *Willowbrook* test because they have presented evidence that they were treated differently from others who were similarly situated. Plaintiffs claim that the only difference between the three white volunteers and the three black volunteers is that the black volunteers are members of the charitable organization. However, plaintiffs allege that the Act does not require that a volunteer be a member of the organization for whom they are volunteering. Plaintiffs note that members of the Lodge volunteered that night (Ivey, Graham, and Thomas) and were not arrested. Additionally, plaintiffs argue that they were volunteers because they were not compensated by the Lodge for their services. Because the plaintiffs were treated differently than the three black volunteers, plaintiffs claim they have satisfied the first prong of the *Willowbrook* test.

Turning to the second prong, plaintiffs argue that there was no rational basis for the difference in treatment concerning the volunteers. Plaintiffs argue that defendants' belief that the plaintiffs, not the Elks, were running the bingo game is without merit. Plaintiffs essentially argue that defendant Johnson failed to "properly investigate the situation prior to calling for the raid." The plaintiffs note that defendant Johnson saw two black men behind the main counter when he entered the bingo hall. They contend that Johnson's interaction with plaintiff Perry only occurred after he could not communicate with Ivey. They note that although Johnson observed Williams making a pay out, he was unable to determine where the money for the pay out came from or what procedures were followed when the pay out was made. Finally, plaintiffs

assert that the defendants were told by Ivey that the plaintiffs were not being paid and that the proceeds from the game were going to the Lodge.

Although plaintiffs assert that a genuine issue of material fact exists as to the equal protection claim, they realize that the qualified immunity issue is a "difficult one to surmount." Plaintiffs first argue that the defendants are not entitled to qualified immunity because the officers violated their constitutional rights. The plaintiffs contend that they have a clear constitutional right to be free from selective arrest. Relying on *Jones v. White*, 992 F.2d 1548 (11th Cir. 1993), plaintiffs claim that in order to make a prima facie showing that a prosecutor violated the equal protection clause, they must show that they have been singled out for prosecution although others similarly situated who have committed the same acts have not been prosecuted. Plaintiff claim they have met this burden by demonstrating that they were singled out for arrest by the defendants while three black volunteers, who were engaged in running the early bird bingo games, were not. Finally, plaintiffs contend that qualified immunity is not appropriate because the constitutional right that was violated has been clearly established. They argue that the right to be free from selective prosecution and arrest has been clearly established in the case law. *See Jones v. White*, 992 F.2d 1548 (11th Cir. 1993); *United States v. Armstrong*, 116 S. Ct. 1480 (1996); *United States v. Smith*, 231 F.3d 800 (11th Cir. 2000).

In reply, defendants argue that the black volunteers were not arrested because they were all officers in the Lodge, the charitable organization that was legally authorized to run the bingo games. They note that plaintiffs were not members of the Lodge. Consequently, arrests were not made based on race but, instead, on membership in the charitable organization approved to operate the bingo games.

Defendants also contend that the plaintiffs' characterization of themselves as volunteers

11

is meaningless. They argue that the term "volunteer" does not appear in the Act and that it appears to be a "ruse constructed to provide a cover for Gustafson's employees." They explain that Ivey did not even know the plaintiffs before they began to "volunteer." He simply got their names and phone numbers off a list he was provided. Defendant Grant notes that she was aware that Macino, Gustafson's predecessor, had put together a list of "volunteers" and that she told him that such a practice violated the bingo law. Viewing these facts in a light most favorable to the plaintiffs, defendants contend that a "rational basis" supported their arrests.

Finally, defendants argue that qualified immunity is appropriate. Defendants contend that the plaintiffs have not met their burden to produce case law arising out of materially similar facts which should have placed them on notice that they were crossing a "bright line" in equal protection law. *See Willingham v. Loughnan*, 2001 WL 920676, at *6 (11th Cir. Aug. 15, 2001) (reversing district court's denial of qualified immunity because "Plaintiff present[ed] no earlier cases that would establish that the Officer Defendants' acts, under the circumstances, were clearly illegal at the time of this incident").

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed during the pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Id.* The non-moving party then bears the burden of showing that there are specific facts demonstrating that there is a genuine issue of fact for trial. *Id.* at 324. "When deciding whether summary judgment

12

is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). The trial court must resolve all reasonable doubts in favor of the non-moving party, but need not resolve all doubts in a similar fashion. *Barnes v. Southwest Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987).

## CONCLUSIONS OF THE COURT

The court concludes that it is unlikely that plaintiffs have established an equal protection claim. The plaintiffs were clearly in a different status than there alleged comparators. They were not members of the charitable organization and the defendants could have reasonably thought that the plaintiffs were present primarily to operate the illegal early bird game at the behest of their lessor/employer. In any event, the defendants are entitled to qualified immunity because a reasonable officer could have concluded that the parties were differently stated. Furthermore, plaintiffs have not cited any fact intensive concrete cases to the contrary. The defendants motion[s] will be granted in total.

This 28TH day of September 2001.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT COURT JUDGE